State vs. Louisiana Debenture Co., Ltd.

## No. 13,105.

THE STATE OF LOUISIANA VS. THE LOUISIANA DEBENTURE COMPANY, LIMITED.

### SYLLABUS.

The debenture scheme exhibited in the defendant's charter being the sale of certificates redeemable at the expiration of seven months, with fifty *per cent.* in addition to the cash paid in, and exclusively from sixty-five *per cent.* thereof, is impossible of accomplishment; and must, necessarily, result disastrously to the investors in such certificates.

Instead of the expectation being realized of all debenture-holders being fully paid with fifty per cent. profit upon their investments, the certainty is that at the expiration of the six years' period fixed, there will be a large proportion thereof unpaid and unprovided for.

The State has an interest in annulling the charter of such a corporation.

ON appeal from the Civil District Court for the Parish of Orleans. *Theard, J.*

M. J. *Cunningham,* Attorney General (*F. E. Rainold* and *Slifft* and *Madison,* of Counsel,) for the State of Louisiana, and *August M. Benedict,* Liquidator, Plaintiffs and Appellees.

*Hugh S. Suthon* and *Charles J. Theard* for the Defendant and Appellant.

*Clegg* and *Quintero* and *Arthur McGuirk* for the Receivers, Charles R. Kennedy and Emile H. Reynes, Appellees.

Argued and submitted May 18, 1899.

Opinion handed down June 22, 1899.

Judgment amended, and rehearing refused, June 30, 1899.

On the application for rehearing by BLANCHARD, J.

The opinion of the court was delivered by

WATKINS, J. The object of this suit is to have the charter of the defendant company declared null and void, *ab initio;* and, in the alternative that it should not be absolutely null, and that the organization was authorized by law, that its charter be forfeited.

The defendants filed some exceptions, which were overruled; and for answer it admitted that it was duly incorporated, as will appear by the annexed charter, and alleged that "it has done business in accordance with its charter."

Preliminarily an injunction was obtained against the company, prohibiting it from acting as a corporation, and from doing any business under its charter; and that it be prohibited from declaring forfeited, or lapsed, any rights of its debenture or certificate holders, by reason of their failure to pay instalments during the pendency of the suit.

Defendant obtained a rule on the State to show cause why the injunction should not be dissolved, and on the trial thereof same was made absolute by the court a qua, "reserving to the plaintiff its right to prosecute this suit on the merits by ordinary process."

On the trial there was judgment decreeing the annulment of the charter of the defendant, and forever prohibiting it from carrying on its affairs.

It further decreed that Charles R. Kennedy and Emile H. Reynes be appointed receivers, upon giving bond, "said officers to have full power to hold, administer, manage, and dispose of the property and income of said corporation in such manner as the court may direct."

That judgment was rendered on the 16th day of February, 1899, and signed on February 23, 1899; but it appears that in the *interim*, on February 17, 1899, the Attorney General filed a supplemental petition, asking for an injunction against the defendant, prohibiting it from acting as a corporation, or from removing its assets from the State, or from making any arrangement, or negotiation, for that purpose; and, on the same day, the judge *a quo* granted an order directing the writ of injunction to issue as prayed for.

The defendant made an application for a new trial, based on several grounds, and same was, by the court, overruled; and, thereupon, it prayed for and obtained an order for a suspensive appeal.

The following is a brief statement of the case, as presented by the petition of the State, to-wit:

"That, on or about the 2d day of June, 1896, an act was passed before Charbonnet, notary, by which several persons named, eight in number, undertook to form a corporation under the title of 'Louisiana Debenture Company, Limited,' domiciled in the parish of Orleans, a copy of which is hereto annexed and made part of this petition, for the purpose of showing its contents.

"That said charter was, subsequently, amended, and a copy of the amendment thereto is annexed.

"That said company is not organized for any purpose for which the "law authorizes the formation of corporations in this State; that said "company is a debenture company, formed for the sole purpose of "selling or borrowing money upon its own obligations or debentures, "to be paid for in monthly instalments, by which said company binds "itself to pay the holders of said debentures a profit of fifty per cent. "upon the amount invested, which said company is without means or "capacity to do, except through the continued payment of instal- "ments by new purchasers of its debentures, and whose money is "used to take up older debentures, and through lapses and forfeitures, "on account of inability to pay money instalments on the part of the "holders of older debentures.

"That said entire system is not legitimate, but is vicious and unjust, and must, necessarily, fail within a more or less limited time.

"That, through the active exertions of solicitors, and the glowing representations of signs, advertisements and circulars, samples of which circulars are hereto annexed as part of this petition, people are induced to invest in these debentures, with the sole hope of making a large profit before the inevitable crash comes.

"That the terms of the debentures are such that the holders are almost sure to lose the full amount invested, or at least half thereof, if circumstances should prevent their continued payment of instal- ments; and a very large proportion of the patronage of said company are among the poorer classes, is very liable to become unable to con- tinue payments, and unable to bear such losses.

"That the whole system amounts to a gambling scheme, and is demoralizing as such.

"That Act 36, of 1888, under which the company claims to be organized, is not a complete and valid law, by reason of its failure to provide for the organization of corporations, and of safeguards, for the protection of the public against pretended corporations exercising a State franchise, and because it only authorizes the organization of corporations for purposes not inconsistent with the existing laws.

"That in so far as the acts which said company pretends, or claims, to do, can be lawfully done by corporations in this State, they pertain to corporations otherwise specially provided for and organized for insurance, banking or homestead purposes; that said company, in its

mode of organization, has not complied with the requirements prescribed for corporations of either of said classes.

"That Act 36, of 1888, was only intended to authorize the organization or corporations for the purpose of carrying on ordinary business of the different kinds, which had, theretofore, been carried on only by individuals and partnerships, so that liability in carrying on such ordinary business could be limited.

"That the whole object of said pretended corporation is, in effect, gambling, tending to encourage the gambling spirit among the people, intending to take the chances of profit by the loss incurred by people thus demoralized; and is, therefore, *contra bonos mores*, against the public policy of the State, and contrary to the laws and spirit of Article 172 of the Constitution of 1879, and of Article 188 of the Constitution of 1898.

"That, therefore, the Legislature did not intend to authorize the organization of such corporations, and if such was the legislative intent, said act is unconstitutional and void.

"That under the color of said Act 36, of 1888, but without legal justification, a large number of debenture companies have been organized in this State; that said companies carry on no business within the meaning of said act; that if their transaction can be designated as a business at all, it is stock-jobbing, and prohibited, in terms, by law.

"That said company is without capital and insolvent. That its organization stock was issued to its promoters and organizers for the use of their names, and not for any labor done, or money or property actually received, in violation of Article 238 of the Constitution of 1879.

"That its bonds or debentures had been issued in the same manner, in order that the names of reputable citizens could be published as holders thereof, as an inducement to others to buy, in violation of the same article of the Constitution.

"That while a few of said companies are claiming to be honestly conducted, it is conceded that the most of them are fraudulent, and only intended as a temporary means of profit by their promoters.

"That the theory upon which said companies operate being vicious, all are bound to fail; the larger the business of any company, the more insolvent it is, and the more widespread losses will be caused by its failure.

State vs. Louisiana Debenture Co., Ltd.

"That the organization of these debenture companies, under the color of an act of the Legislature, thus operating under a State franchise, and imposing upon the people by reason thereof, even if a few of such companies are honestly conducted, would work great injuries and loss to the people, and be just cause for public scandal."

The further allegation is made that the president, secretary, and other officers of the defendant company, "are unlawfully exercising a corporate franchise, and are acting as a corporation in this State without having been legally incorporated, and in violation of law, and will continue to do so, unless enjoined therefrom; that the public interest and common justice require that said company be enjoined from declaring forfeited the rights of any debenture holder who does not continue paying his monthly instalments during the pendency of this suit; and that the affairs of said company be liquidated according to law, under the direction of the court, for the common benefit of all creditors and other persons interested according to their respective rights."

The further allegation is made that, "even if the business of the defendant were legal, it is not a corporation by reason of the fact that a so-called charter, * * * although signed by the parties named above, does not contain any statement whatever of the number of shares subscribed for by each of said signers, and no list of original subscribers is recorded in the mortgage office for the parish of Orleans, the domicile of the pretended corporation. as required by law."

Upon the foregoing petition, the prayer of the State is, that the defendant be enjoined "from acting as a corporation, and from doing any business under its pretended charter; that it be enjoined from declaring forfeited, or lapsed, any rights of its debenture, or certificate holders, by reason of their failure to pay installments, during the pendency of this suit."

The further prayer is for judgment, declaring said pretended charter null and void; that if it should be held that the organization of said company was authorized by law, its said charter be forfeited—reserving the right to apply for the appointment of a liquidator, under Revised Statutes 731. That Jules E. Brulatour be appointed receiver to take charge of its effects, and liquidate the affairs of the company, etc.

The exceptions of the defendant, above referred to, are:

1. That the allegations in the petition are vague and indefinite, and set forth no cause of action. 2. That the petition sets forth inconsistent and irreconcilable demands, and plaintiff should be ordered to so amend its pleadings, as to sue either for forfeiture of defendant's charter, or for its annulment.

Our opinion is, that the two demands of the State may be fairly construed and taken in the alternative.

It would hardly be claimed that it is necessary for the State to institute suit for the purpose of having it declared, that the defendant was not a corporation, and in case judgment should go against her, that she should have to bring a second suit, in order to have the charter of the company declared forfeited.

Fairly considered and construed, the allegations of the State are, that the defendant is not a corporation in a legal sense, and, therefore, not authorized to exercise its franchise; or, if found to be duly chartered, and apparently regularly organized, the same should be revoked upon the ground, that the purpose of the organization is, in legal effect, a fraud upon the law—the business which it is pursuing being illegitimate and against good morals and public policy.

From the foregoing synopsis of the pleadings it appears, that this is a controversy between the State and the debenture company, exclusively—neither creditor nor debenture holder having been made a party to the suit, or having made any complaint.

The charter of the company, which is annexed to the petition of the State and made a part thereof, shows, that eight persons signed the same as the persons organizing the corporation, in the presence of a notary and two witnesses. The certificate of the deputy recorder of mortgages thereupon endorsed shows, that the act of incorporation was duly recorded in mortgage book No. 565; and the certificate of the notary furnishing the certified copy upon which said certificate of the deputy recorder is endorsed, bears date of June 4, 1896.

In the caption of the charter, the statement is made, that the several persons whose names are hereto subscribed declared, "that availing themselves of the provisions of Act 36 of 1888, as well as those of the general laws of the State of Louisiana relative to the organization of corporations, they have covenanted and agreed, and do by these presents agree to form themselves into and constitute a body corporate in law, for the objects and purposes, and under the agreements and stipulations hereinafter set forth."

Article one provides, that the corporation "shall have power to contract, sue and be sued, make and use a corporate seal, and to hold, purchase, sell, mortgage and pledge property, real and personal, to borrow or lend money, to make by-laws for the proper conduct of its business, and to do and perform all acts proper and necessary to carry out the purpose of this organization."

The second article provides that the corporate powers of the company shall be exercised by a board of eleven directors, five of whom shall constitute a *quorum* for the transaction of business—designating the names of the stockholders who are to constitute the first board of directors.

It also declares that there shall be a president, vice-president, secretary and treasurer, for the management of the business of the company.

Article four declares that "the objects and purposes for which this company is organized, are declared to be, to encourage economy and thrift, by providing a means for the investment of small sums of money, issuing debentures maturing at a fixed date, to be paid for by monthly installments, and returning to the investor a liberal profit upon his investment."

Article five declares, that "the capital stock of the corporation is hereby declared to be $100,000.00, divided into 1000 shares of $100 each, to be paid for in such installments and at such times as the board of directors may determine. The company shall commence business when $50,000.00 of capital stock shall have been subscribed.

"No certificates of stock shall be issued until the amount subscribed shall be fully paid."

Article six provides, that "the debentures issued by this company shall be for the fixed sum of $216.00, maturing six years from date of issuance, the company reserving the right to redeem them in numerical order, at any time after seven monthly instalments have been paid thereon. All debentures shall be signed by the president and secretary, and bear the seal of the company. Applications for debentures shall be made on forms prescribed by the company, and issued under rules and restrictions established by a board of directors. Payments on debentures shall be $2.00, payable monthly in advance, and due the first day of each month, but investors will be allowed until the tenth day of each month to make payments. A failure to make payments due as required above, operates a forfeiture of all payments

previously made, and annuls debentures on which said instalments· are due and unpaid; provided, however, that a debenture on which seven instalments have been paid, shall have a surrender value of 50 per cent of the amount paid in, payable after thirty (30) days from date of lapse."

Article seven provides, that the "holders of debentures upon which seven installments have been paid, may secure loans from the company thereon, under rules and regulations to be established by the· board of directors."

Article eight provides, that "the funds of the company received in payments of debentures, shall be distributed as follows:

"Redemption fund.. .... ........ ...... .........∴.65 per cent,
"Reserve fund.,........ .......... ............. .......· ......25 per cent.
"Expense fund...... ...... ...... ......... .........10 per cent.

"The redemption fund shall be applied to the redemption of debentures seven months old and over, in their numerical order, redemption day to be the 15th of each month.

"The reserve fund will be invested to the end of securing redemption of all debentures running to maturity.

"The expense fund will be applied to payment of expenses of the business." ˙

Article nine provides, that "all debentures shall be issued in regular numerical order, those issued from 1st to 15th inclusive, shall bear date of first of month in which issued; from 16th day of month they will bear date on the first of the succeeding month.

"Redemptions will begin when debentures are seven months old,. (i. e., when seven payments have been made thereon), the investor receiving a profit of 50 per cent, on his investment, provided all payments due shall have been paid and debentures be surrendered to the company to be canceled. Debentures shall be non-transferable before· maturity."

Article ten provides, that "no stockholder shall ever be liable for the contracts or claims against this company in any further sum than the unpaid balance due on shares subscribed by him; nor shall any mere informality in organization have the effect of rendering this act invalid, or of exposing a stock-holder to any liability beyond such unpaid balance. No debenture holder shall be liable for any indebtedness due by this corporation."

Article thirteen provides, that "in case of dissolution of this cor-

poration, the board of directors shall remain in office until a complete liquidation of its affairs, with power to fill vacancies occurring on said board.

"The sale of debentures shall cease from date of vote to liquidate. In liquidating the company, the board shall have the option of redeeming all non-matured debentures by paying the holders thereof the full amount thereon, with interest at 6 per cent., or to continue the monthly redemption, exacting the monthly installments as before."

The foregoing is a full and complete synopsis of the charter of the defendant company.

The following is the form of the debenture certificate issued by the defendant company:

## "LOUISIANA DEBENTURE COMPANY, LIMITED, NEW ORLEANS, LOUISIANA."

### ISSUES

"This debenture to —— upon —— written and printed application, dated —— day —— 189—, and in consideration thereof and of the payment in advance of Two Dollars, and of the monthly payment of Two Dollars to be made thereafter, at the office of the company in the city of New Orleans, or to any duly authorized local depository, on or before the first day of each month in every year following the date hereof, during the existence of this contract, until seventy-two monthly payments shall have been duly paid to the company."

(Then follows an exact reproduction of Articles 6 and 9 of the charter.)

"The Louisiana Debenture Company, Limited, does promise to pay to the said ———————— in six years from the date hereof, unless sooner redeemed in accordance with the terms and conditions endorsed hereon, and made part of this contract, the sum of two hundred and sixteen dollars upon the delivery and surrender of this debenture to this company.

"*In Witness Whereof,* the undersigned officers of said company have signed and delivered this debenture at the City of New Orleans, Louisiana, the first day of —— *One Thousand, Eight Hundred and Ninety* ——.

(SEAL)                                 "————————————, President.
"———————————— Secretary."

Annexed to the record and brought up in the original, is a copy of the debenture certificate above quoted. There is, also, a printed cir-

cular of the company annexed to the record and brought up in the original, which makes a statement of the defendant's plan of operation under its charter, and gives the practical workings of the organization for a period of eighteen months.

It shows that the reserve fund of twenty-five per cent., which constitutes the fund of the company received in payments on debentures, is regularly invested in substantial securities, and that same can not, under any circumstances, be used for any other purpose than for the protection of debenture holders. That the scheme of the defendant presents an opportunity to investors of moderate means so feasible as to press its merits upon them.

"The small sum of six and one-half cents a day which would, otherwise, be spent in trivialities, will, at the end of each month, make up the requisite $2.00 for each monthly payment on each debenture. This monthly saving of the old and young, encourages economy and thrift, and apart from the profit derived, is of itself a boon to the beneficiaries, etc."

The plan upon which the defendant company works is alleged to be "practically on the same basis as that of the level premium life insurance companies," the difference being only in mode of operation in conducting the business.

That debentures are issued for the fixed sum of $216.00, maturing six years from date of issue—the company redeeming them in numerical order after seven monthly instalments have been paid thereon. That payments of debentures shall be $2.00, payable monthly. A failure to make payments due, operates as a forfeiture of all payments previously made, and annuls debentures upon which instalments are due and unpaid; but in case a debenture holder has paid in seven installments, he is entitled to the surrender value of fifty per cent of the amount paid in, after the lapse of thirty days.

That a loan can be had from the company by the debenture holders, after seven payments have been made—the company accepting the debenture as collateral security, and charging only a moderate rate of interest on the loan.

That "the reserve fund of twenty-five per cent., together with the capital stock, forms the guarantee for the payment of any debenture running to maturity. This fund is held in trust for this purpose.

"This reserve fund being reinforced monthly by 25 per cent. of receipts, and continually compounded, will, even at a low rate of in-

terest, reach such proportions as to render absolutely secure the payment of any debenture reaching maturity."

The statement of the circular in regard to the advantages of the organization is, that "the principle which underlines the plan, is the same as that upon which life insurance is founded."

The company sells a short term endowment in which the death risk is eliminated, and the debenture holder enjoys the fruits of a prudent investment during life.

The obligation of the debenture holder is limited to payment of his monthly installments.

The circular further states that the redemption of debentures is made from the sixty-five per cent. redemption fund, in monthly payments upon the debenture certificates in their numerical order, the value at redemption to be according to the table given, as follows:

| "Months | Cost. | Value. |
|---|---|---|
| "7 | $14.00 | $21.00." |

That is to say one debenture will have cost the holder $14.00 at the expiration of seven months, which, with the addition of fifty per cent. of the amount paid in, raises same to the value of $21.00.

Again:

| "Months | Cost. | Value. |
|---|---|---|
| "8 | $16.00 | $24.00." |

One debenture for eight months, costs the holder $16.00, and the fifty per cent. added, makes it worth $24.00. So, carrying this calculation through a period of 72 months, the debenture holder will have paid in $144.00, and the value of the debenture will be $216.00—that is, its face value.

The circular further states, that life insurance companies collect from policy holders, on an average, an annual premium of $32.00 on the amount of $1000.00 of insurance, whereas only $9.75 of the above premium is used for the payment of losses by death.

The circular makes the further statement, that for the last 35 years, life insurance companies have used in the payment of losses by death, for one thousand dollars, the following amounts:

New York Life ............................$40 00
Equitable Life ...........................$42 00
Mutual Life ..............................$75 00
North Western Life .......................$35 00
Berkshire Life ...........................$41 00

making an average of forty-seven dollars per thousand.

Based on that table, the statement is, that an average of $47.00 has been sufficient for life insurance companies to pay off every policy of $1000.00, that has become due by death.

That there has not been one dollar paid by any life insurance company, that was not received from its policy holders, and still, for the past thirty-five years, the companies have liquidated losses by death notwithstanding they have received only an average of $32.00 per annum on the $1000.00 from every policy holder who has died.

The further statement is made, that of every one million dollars of life insurance written, less than one-half is finally paid up; that is to say, more than fifty per cent. of the total number of policies written lapsed, by reason of the policy holders' failing to pay their annual premiums.

Consequently, by means of this large per cent. of lapses, the company is enabled to pay off its losses by death, with a considerable surplus left.

It is stated further, that from this source alone, the Mutual Life has accumulated a reserve fund of one hundred and eighty millions.

This lapse feature is one of the important considerations upon which the operations of the defendant company are based.

They say, "if life insurance companies with their exactly similar feature, can commence with one hundred thousand dollars capital, and by the marvelous growth in prosperity during their existence of forty to fifty years, clear millions of dollars in their grand scheme of usefulness, and accumulate $200,000,000 in assets, where is the ground of apprehension regarding debenture companies who simply present a 'Short term endowment policy,' eliminating the death element and enabling debenture holders to enjoy the benefits during life?"

The circular makes this statement in conclusion:

"As has been shown from the above official figures of insurance companies, that they are able by utilizing $9.75 annually to liquidate $1000.00 in six years for losses by death, or about $20.00 for one dollar received from these dead members, does it look impossible for (the defendant) by using $36 to pay its contract holder $216.00 in six years, or $1.50 for $1.00?

"The item of lapse is a potent factor in enabling us to carry out our contracts.

*     *     *     *     *     *     *

"Thus far we have redeemed 3003 debentures, reducing our indebt-

·edness, and have paid out to these debenture holders $92,444.00.    Our success foreshadows what we can do, and the future of debenture companies is as certain of success as are well managed life insurance companies."

A noticeable feature of the charter is, that while the capital stock of the corporation is declared to be one hundred thousand dollars, divided into shares of $100, same is to be paid for in such instalments and at such times as the board of directors may determine.

Another feature is, that the company shall be entitled to commence business when $50,000.00 of capital stock shall have been *subscribed.*

Another is, that no certificates of stock shall be issued, until the amounts subscribed for shall be fully paid.

Therefore, there must be a resolution of the board of directors determining the amount of the instalments on the stock subscriptions which are to be paid, and the time when such payments are to be made; and, thereupon, the certificates of stock shall be issued.

On this provision of the charter, it is apparent, that shares of stock are necessarily paid at the date of issuance; and up to the time when they are issued, the obligations of the stockholders are represented by their subscriptions alone.

Now, it must be remembered, that the *stock subscriptions* are intended tr represent, together with the reserve fund of twenty-five per cent. th ɔ *guarantee* of the company for the payment of the debenture certifi ates; and, in case the redemption fund of sixty-five per cent., with the added interest compounded accumulating thereon, and the sur realized from the lapses and forfeitures of debenture holders, sh ɹuld be insufficient to discharge the debenture certificates which are ·ɹ be redeemed, any surplus there might remain in the expense fund, and, also, the amount *paid in on stock subscriptions,* could be called upon to respond to the deficit—no stockholder being "liable for the contracts of, or claims against the company in any further sum than the unpaid balance due on shares subscribed by him."

This last provision of the charter is a usual feature in the acts of incorporation of. business organizations, and it is necessarily so, in order that stockholders should avoid any risk beyond the amount of their investments.

But the plain deduction from that reservation is, that the *stock subscribers* are responsible to the creditors of the company, and among them the debenture holders, for such a part of the stock subscriptions

as they have not paid in, in pursuance of notice given by the board of directors.

In support of this statement, we cite the following paragraph from the company's circular, to-wit:

"The reserve fund, of twenty-five per cent., together with the capital stock, form the *guarantee* for payment of any debenture running to maturity.

"This fund is held in trust for this purpose."

The charter provides specially, that "no debenture holder shall be liable for any indebtedness due by the corporation."

From the foregoing it appears, that the funds which the company receives in payment on debentures is expected to supply the redemption fund, the reserve fund, and the expense fund in the proportions given; and that payments made to holders of debenture certificates must be made from the redemption fund with its accumulations of interest, and from the lapses of debenture holders, and, in case of same falling short, the expense fund and cash payments on stock may be called upon to assist.

In support of the foregoing observations, the following extracts from the testimony of the secretary-treasurer may be consulted with advantage:

"Q.—Is that 65 per cent. total amount received from debenture holders?

"A.—The credit to my redemption fund amounts to $150,125.50; that is, the credit to my redemption fund since business began.

"Q.—And how much of that have you placed of the redemption fund, or used in actually redeeming the amount you have just now stated?

"A.—I have used an amount approximately, of $8,000 in excess of my 65 per cent. in redeeming debentures.

"Q.—The amount, under the charter, which you should use for redemptions, is that the idea?

"A.—The charter provides that I shall apply 65 per cent. of my receipts to the redemption of debentures; but the charter does not prohibit me from spending my expense money, or my capital stock for that purpose, if I find it expedient to do it.

"Q.—As a matter of fact, you used more than 65 per cent of your receipts for the redemption of debentures?

"A.—Yes, sir."

That witness makes the further statement, that during the first eighteen months of the defendant's business, the total number of lapsed debentures was 202, and that the amount paid in or by these debenture holders was $2,328; and as lapsed debenture holders were only entitled to receive 50 per cent. of the amount paid in, there was, necessarily, $1,164 in the hands of the company on that score.

The further statement of the witness may well be taken in the same connection:

"Q.—What else have you?

"A.—I have the liability of my stockholders for the unpaid balance· on 500 shares of stock, $46,250.

"Q.—The liability of your stockholders?

"A.—Yes, sir.

"Q.—For how much?

"A.—$46,250.

"Q.—Who are the subscribers to the capital stock?

"A.—Well, it is a long list, I will read it to you.

"Q.—Give it to us and tell us how many shares each subscribed.

"A.—Do you want the total amount of shares, $116,119.55?

"Q.—That includes the item of what you call the liability of your· stockholders for unpaid subscriptions?

"A.—Yes, that is a liability; I can call on them.

"Q.—It amounts to $46,250?

"A.—Yes, sir."

The witness then furnishes the names of the stockholders, and the· number of shares each of them hold respectively.

The certificate of the stock subscription reads as follows:

"The undersigned hereby subscribe ———— shares of the capital stock of the Louisiana Debenture Company, Limited, of $100 each, · payable as called for by the board of directors, provided no calls shall be made in excess of 10 per cent. of subscriptions, and an interval of.· at least 30 days to elapse between any two calls."

The interrogation of the witness then proceeds:

"Q.—Now, what has been paid by subscribers upon the· subscrip-- tions, so far?

"A.—A call for five per cent.

"Q.—How's that?

"A.—There was a call for five per cent.

"Q.—Was that paid by all of your subscribers?

"A.—It was paid by all the capital stock.

"Q.—Five hundred shares paid five per cent?

"A.—Yes, sir.

"Q.—Then you collected $2500?

"A.—Yes, sir.

"Q.—You collected that in cash?

"A.—Yes, sir.

"Q.—Was there ever any other call made on subscriptions?

"A.—No, sir.

"Q.—So that your corporation has been running from its incipiency, to the present date, with merely $2500 of capital contributed by the stockholders?

"A.—Yes, sir."

From this statement it appears, that the $2500 which was paid on stock subscriptions, added to the amount in the redemption fund, was sufficient to pay all the matured debenture certificates at the expiration of the first eighteen months of the defendant's business, less a few hundred dollars which was supplied from the expense fund; and that without taking into consideration the amount received from forfeited and lapsed debentures. It further appears that the cash subscriptions on the stock which had been called for by the board of directors, was only intended to meet the deficit in the redemption fund; and on the theory of the defendant, there was no other occasion for an additional call to meet any like deficit.

On this statement, the theory of the defendant company appears to be, that matured debentures are to be paid primarily from the redemption fund; and if that were found insufficient, any deficit could be paid from the fund realized from lapsed debentures, from any surplus in the expense fund, and in case of necessity, from the cash realized by calls upon the stockholders—the unpaid portion of the stock subscriptions remaining as a *guarantee* for the payment of the debentures maturing in the future.

It is reasonable to suppose that many persons were induced by the attractive presentation of the opportunities afforded by the company to take debenture certificates, in the expectation of being able to pay the monthly instalments, who found themselves unfortunately circumstanced at a latter period and necessitated to allow them to lapse. Such is a well known experience of the holders of life insurance policies, though it is not considered as an unreasonably speculative under-

taking, and it is doubtless from this source that debenture companies anticipate realizing large profits as a means of redeeming debenture certificates.

An examination of the record discloses the fact, that aside from the evidence furnished by the charter of the defendant company and the circular, the case of the State rests upon the testimony of one single witness who was introduced on the part of the State—he being secretary and treasurer of the defendant company—counsel for the defendant likewise resting its case upon the statements made by that witness.

Therefore an examination of the testimony of that witness, when applied to the foregoing statement of the pleadings and charter, is to be solely depended upon for the solution of the issues we are to determine.

He testifies, that he has been secretary and treasurer of the Louisiana Debenture Company, Limited, since its organization on June 2, 1896; and that since that date, the company has issued 10,265 debentures. That there were raised in the first month 179; in the second month 230; third month 1,096; fourth month 477; fifth month 184; sixth month 327; seventh month 638; eighth month 721; ninth month 658; tenth month 748; eleventh month 627; twelfth month 661; and so on.

That the total amount of money the company received from debenture holders from the beginning up to the date the witness delivered his testimony, was $230,668.00—the witness then enumerating the various amounts received by the month; as for instance, amount received June, 1897, $11,356; July, $10,866; August, $10,233; September, $10,466; October, $11,764; November, $10,922; December, $10,728; January (1898), $11,318; February, $10,700; March, $11,332; April, $10,032; May, $9,622; June, $9,600; July, $9,602; August, $8,834; September, $9,010; October, $8,492.

This suit having been filed on May 20, 1898, it appears to have exercised but little influence upon the purchase of debentures, as the rate per month during the five months subsequent thereto was not appreciably less than it was during the five months previous.

The witness states, that the company began redeeming debentures on December 15, 1896—date of the expiration of the 7 months from the commencement of business. That during that month, the company

redeemed 179 debentures, and in redeeming, paid them $1.50 for every dollar paid in.

That in making these payments, the company used $3,759.00—the debentures being seven months old.

During the next month, the company took up 200 debentures, and paid $4,200; in the next month the company took up 29 debentures, expending $696; and 176 debentures, expending therefor $3,696— making a total of expenditures of $4,392.00.

The witness then carries the statement through all the various succeeding months, showing the total number of debentures taken up and the amount expended therefor.

He states the total number of debenture bonds redeemed during the months enumerated, was 4,159, and that the company used in paying those debentures $158,474.

He states, that that sum was $8,000 in excess of the redemption fund of 65 per cent., and that this sum was raised from the surplus in the expense fund, and from the cash subscriptions on stock which had been collected. He states that the total amount which had been placed in the expense fund of 10 per cent. from the time the company began business up to the time the witness delivered his testimony was $28,096.20; and that there had been placed during the same period of time in the reserve fund of 25 per cent., $57,740.50.

From the foregoing statement, it appears, that all the matured debentures have been paid from the sources specified, and that the reserve fund is still intact, and the stock subscriptions also, with the exception of 5 per cent., aggregating $2,500.

He says in regard to the surrender of forfeited debentures, that the first one he paid was in October, 1897—that was 16 months subsequent to the commencement of defendant's business. That in that month there were five forfeitures—giving the age of each—same being over 7 months old, and that the holders were entitled to the return of 50 per cent. of the amount they had paid in.

He says that in some instances, debenture holders who forfeited their certificates had borrowed money from the company, and in such cases, they were settled with by the surrender of their notes.

The witness then proceeds to make a full statement of all the forfeitures, the months in which they occurred, and the amounts which were paid to the debenture holders, and concludes with the statement,

that on the 27th of October, during 18 months, there had been 202 debentures forfeited, upon which had been paid $2,328.

Then follows this statement:

"Q.—I wish to know how many bonds have been forfeited; how many bonds are outstanding?

"A.—According to my memorandum, I have 4368.

"Q.—And that are still outstanding?

"A.—Outstanding; yes, sir; of course that is an approximation; may be more, or may be less.

"Q.—How much have the holders of these 4,368 certificates paid the company?

"A.—They have paid $139,855.

"Q.—Does that represent the total amount they have paid in?

"A.—Yes, sir.

"Q.—Where do you get your figures from?

"A.—From my register, sir."

\*         \*         \*         \*         \*         \*         \*

"Q.—Now, Mr. Wall, for the purpose of clearness, in order to make the testimony certain, let us have a recapitulation of the matter we have gone over.

"Q.—The total number of bonds issued by the company is 10,265, is it not?

"A.—Yes, sir.

"Q.—The total amount received by your company, including the first payments, was $251,482.00, is that correct?

"A.—That is practically correct, sir.

"Q.—Now, the total number in force to-day is, 4,868 bonds, upon which you received $139,855?

"A.—Yes, sir.

"Q.—I therefore make it that the difference between the amount in force and the amount issued is 5,897 bonds; of that 4,150 bonds were redeemed, were they not?

"A.—4,160, as a matter of fact.

"Q.—4,160?

"A.—Yes, sir.

"Q.—I calculate that your company received from these bond holders $102,216; is that correct?

"A.—Well, as we paid out——

"Q.—Paid out $153,474?

"A.—Two-thirds of the amount paid out, one-third being profit.

"Q.—That makes $102,316 received, and your company paid out to redeem those bonds $152,474?

"A.—Yes, sir.

"Q.—The difference between the number forfeited and the number that are outstanding is 1738 bonds; those are forfeited, are they not?

"A.—That is approximately correct.

"Q.—I calculate your company paid out to these forfeited bond holders $4655; is that correct?

"A.—Forfeited bonds?

"Q.—Yes.

"A.—My statement shows that I have had so far on the forfeited bonds $2003.

"Q.—$2020, only?

"A.—Wait a moment, $2402—$2328—I had added in some that were not called for, $2328, I show.

"Q.—I don't think the calculation quite agrees, and therefore, I would like you to go over the figures. You received altogether $251,-482? Did you not?

"A.—That is approximately correct.

"Q.—Now, then, two-thirds of the amount paid to bond holders whose bonds were redeemed gives me $102,316. That is the amount paid in by the bond holders, whose bonds were redeemed?

"A.—Yes, sir.

"Q.—And you told me that the bond holders, whose bonds are still in force paid you—paid into your company $139,855?

"A.—Yes, sir.

"Q.—I find that the bond holders whose bonds were forfeited paid in $9311; have you any figures to verify that calculation?

"A.—Yes, sir.

"Q.—It is a calculation from the figures you gave me?

"A.—Yes, sir; at the same time I have not made it.

"Q.—As a matter of fact, however, you only paid out how many dollars; twenty-three hundred and how many?

"A.—$2328, my ledger shows that; the surrender value of the debentures surrendered."

On this statement, the company appears to have received and enjoyed profits upon these forfeited debentures of $37,539.

In the course of the witness' interrogation, the next question taken

up was, the value of the assets of the company, and what those assets consisted of.

| | |
|---|---:|
| He places the value of the office fixtures at | $   604.95 |
| Bills receivable at | 22,549.00 |
| Real estate (office building) net | 30,000.00 |
| 5000 N. O., C. & L. R. R. bonds | 55,350.00 |
| 1000 Premium bonds | 2,150.00 |
| 5500 La. 4's, worth | 5,830.00 |
| 50 shares of stock, People's Bank | 1,950.00 |
| 3000 of Orleans Railroad 6's | 2,700.00 |
| Total | $121,133.95 |

The witness states that the bills receivable represent loans made to debenture holders of 50 per cent. of the amount of their certificates.

A painstaking and very careful study of the scheme of the defendant company as exhibited on the charter, and upon the testimony of its secretary, discloses the following condition of its affairs at the date of the trial in the District Court:

### Assets.

| | |
|---|---:|
| Profits realized on forfeitures | $37,539.00 |
| Reserve fund | 65,330.33 |
| Liabilities of stockholders | 46,250.00 |
| Stocks and other property | 121,133.95 |
| Total | $270,253.28 |

### Liabilities.

| | |
|---|---:|
| Outstanding debentures, 4,368 at $216 | $943,488.00 |
| Difference | 673,234.72 |

The foregoing figures are only illustrative, and are given merely for purposes of illustration. And the statement of debentures as liabilities, is only intended to represent them as *contingent* liabilities.

This statement does not include the lapses nor the four years of time contemplated yet to run under the charter.

The serious question presented is, as to the means the company exhibits with which to discharge its liabilities to debenture holders of $673,234.72 beyond its avail, within a period of four years.

The proof discloses, that the reserve fund of $65,330.33 is invested

in good securities; but they are presumably negotiable in character, and, therefore, easily transferable. The testimony in the record discloses no assurance that the stock subscribers representing a guarantee of $46,250.00 are worth that sum, or any amount; they can not, therefore, be considered as furnishing a safeguard for the payment *pro tanto* to debenture holders. So far as we can discover, there is no possibility, in the very nature of things, for the advantage of the defendant to realize a sufficient amount to discharge a proximate liability of over a half million of dollars within the brief period of four years.

A scheme predicated upon this basis, and which has worked out within two years the results stated, is certainly very insecure and speculative in the extreme.

Of the capital stock of $100,000 provided for in the charter, only one-half has been subscribed for, and of that, only 5 per cent., or $2500 has been called for by the board of directors, or paid up.

The debenture holders have furnished all the money with which to supply the redemption fund, the reserve fund and the expense fund; in other words, the money which the debenture holders have paid the defendant company, has discharged all expenses and is relied upon to return them the amounts of their investments, and the large profit of 50 per cent. thereupon.

Judging from the figures already given, it is impossible to conjecture in what way the company's expectations are to be realized.

To put the situation in its strongest light, it is submitted that if all the debentures were forfeited at this date, the holders would be entitled to receive from the company $314,496 as the surrender value, approximately; and that would be $44,242.72 in excess of all the company's available resources, if they could be converted into cash.

It does not seem possible that the interest on the reserve fund could improve the situation materially.

The claim of the State is, substantially, that the company is not a legally organized corporation; that its business is operated with little or no capital; and the evidence clearly shows that there is in the business no possible reproduction, and no method of adding to its assets. That the company in return for monies invested, obligates itself to pay the amount of subscriptions for the debentures, and a profit of 50 per cent. upon the amount paid in by the subscribers, at times mentioned in the charter; and that the company, in order to carry on its

business, is empowered to declare lapses and forfeitures for non-payment of the dues of debenture holders—recognizing their right to the surrender value of 50 per cent. of the amount paid in, provided they continue to pay for seven consecutive months.

We consider it unnecessary to enter into any elaborate discussion of the principles of law or questions of practice which have been extensively and interestingly discussed by attorneys on both sides of this controversy.

The proximate result of our investigation is, that the scheme of the defendants can not possibly accomplish the results which its charter proposes.

The plan of operations is not feasible. Conceding to its promoters and stockholders perfect good faith and absolute honesty, the enterprise can not work out good results, and in the end, the debenture holders must, inevitably, suffer serious consequences.

It is our clear conviction that the State has an interest in setting measures on foot to prohibit its further operation.

We are, therefore, of the opinion, that the judgment of the lower court is correct in decreeing the forfeiture of the defendant's charter; but the same should be in other respects, annulled and reversed.

It is, therefore, ordered, adjudged and decreed, that the judgment appealed from, in so far as the same decrees the nullity and forfeiture of defendant's charter be *affirmed;* and that the same, in so far as it appoints a receiver or liquidator be *reversed,* leaving to the State of Louisiana and all other parties in interest, all rights under the law relative to the appointment of a receiver or liquidator, to take charge of, liquidate and settle the affairs of said corporation—the defendant to pay cost.

MONROE, J., recused.

### ON APPLICATION FOR REHEARING.

BLANCHARD, J. In this case, on the 22nd of June, 1899, as relates to the appointment of a receiver or liquidator, a decree of the court was handed down, which, in part, read as follows, viz:

"That the said judgment, in so far as it appoints a receiver or liquidator, be reversed, reserving to the State of Louisiana and all other parties in interest all rights under the law relative to the appointment of a receiver or liquidator."

The attorney general and associate counsel have filed an application for rehearing, and so have counsel for defendant.

The State avers that the public interest and particularly the interest of the debenture holders demand a settlement of the question as relates to the appointment of a receiver or of a liquidator; and the State asks that the liquidator appointed by the Governor be recognized.

These cases were argued late in the session. The argument was directed to the question of the legality vel non of the charter under which the respective companies carried on business.

The illegality of the charter was decreed. The court considered that, as to liquidator or receiver vel non, contradictorily with parties in interest, the question can be considered in the District Court, to which the judgment is remanded for execution.

The whole question as to the appointment of liquidator or receiver is left at large and to be considered as an original question. Whether the appointment of liquidator lies with the Governor or of receiver with the court, or the parties in interest, we do not determine. It is left as an open question.

The judgment appealed from is affirmed except as specially reversed and amended.

Rehearing refused.